Caleb C. Magruder and Wm. H. Tuck, Ex'crs of Jane M. Carroll, *vs.* George W. Carroll and others.

A testator executed his will in 1837, and subsequently sold a portion of his real estate, and purchased other, of which, in 1851, he died seized and possessed. Held, that the act of 1849, ch. 229, operates upon this will, and the after acquired real estate passes by it.

This act has a retroactive operation, and applies to wills made *before* its passage by parties who die *before* that time, and to wills made *before* the 1st of June 1850, by persons who die *after* that day.

The wills exempted from its operation by the second section of the act, are those which are made *before* its passage by persons who may die between that time and the 1st day of June 1850, and in which the intent to pass the property which the testator may own at his death does not appear.

If this act was constituted of its first section, it would operate only on wills executed *after* the 1st day of June 1850: statutes are not to have a retro-

active effect, unless it be perfectly obvious such was the intention of the legislature.

If any part of a statute be intricate, obscure, or doubtful, the proper way to discover the intent is to consider the other parts of the act, and in the construction of part of a statute every other part ought to be taken into consideration.

The first and second sections of the act of 1849 must be construed together, and by so doing the first section must refer to wills executed *before* as well as *after* the 1st of June 1850; the office of the second section is merely that of an exception withdrawing from the general purview, and operation of the *first*, the particular wills mentioned in the *second*.

A testator bequeathed his slaves to his wife, requesting that none of them be sold for his debts, but that they be paid out of his other personal estate, and made his wife the residuary devisee of his estate, both real and personal. The widow subsequently died leaving a will, by which she manumitted the negroes. HELD :

That the executors of the widow could not restrain the administrators of the husband, by injunction, from selling the negroes for payment of the husband's debts.

The rights of his creditors could not be affected by any *requests* in his will; they have the right to proceed against his entire estate for payment, first, however, against the personal as the primary fund.

This is not a case of contribution and marshalling of assets between *different* devisees and legatees, the widow being both specific devisee and legatee, and residuary devisee and legatee.

APPEAL from the Equity Side of the Circuit Court for Prince Georges county.

Michael B. Carroll died in August 1851, leaving a will executed on the 10th of September 1837, by which he devised, "after payment of debts," &c., as follows: "Item, to my dear wife, Jane, I give and bequeath all my slaves, and do request that none of them may be sold or disposed of for the payment of my debts, but that provision shall be made for discharging the same out of the other personal property and effects which I shall leave at the time of my death." * * * "Item.—All the rest and residue of my property, both real, personal and mixed, I give, devise and bequeath to my said wife, Jane, whom I do hereby constitute and appoint sole executrix of this my will," &c.

The widow proved the will, accepted its provisions, ob-

tained letters testamentary thereon, and died in September 1853, leaving a will, executed on the 15th of July 1853, by which she manumitted all her slaves five years after her death, devised her real estate to several devisees therein mentioned, and appointed the appellants her executors, who filed their bill for an injunction restraining the administrators *d. b. n.* of Mr. Carroll from selling the negroes for the payment of his debts. The allegations of this bill are fully stated in the opinion of this court. The administrators *d. b. n.* and heirs at law of Mr. Carroll, and the devisees of Mrs. Carroll, were made defendants.

The court, (CRAIN, J.,) refused the injunction, remarking that Mrs. "Carroll, the executrix, did not settle or pay the debts of the testator, Mr. Carroll, and as the laws of Maryland prevent and prohibit executors and administrators from selling negroes without an order of the orphans court, I must conclude that that court deemed a sale necessary to discharge the debts of Mr. Carroll. The funds set apart by Mr. Carroll to pay his debts are considered insufficient for that purpose, and as I am not satisfied that the after acquired real estate is liable for his debts before the negroes specifically bequeathed to Mrs. Carroll, and doubting the policy of interference in this case, I refuse to grant the injunction." From this order the complainants appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON J.

*C. C. Magruder* for the appellants.

1st. If the act of 1849, ch. 229, does not apply to the will of Mr. Carroll, then the lands descended are first applicable to the payment of the debts in exhoneration of the negroes specifically bequeathed. 11 *G. & J.*, 186, *Chase vs. Lockerman.* 1 *White and Tudor's Leading Cases*, 450. 3 *Johns. Ch. Rep.*, 148.

2nd. The case of *Chase vs. Lockerman*, shows that in general the specific legatee of personal estate and the specific

43      v.4

devisee of real estate are to contribute ratably in payment of debts. But the specific legatee of personalty is to be preferred to the residuary devisee of real estate, and especially where the devise of the residue is to take effect after payment . of debts. °1 *Ambler*, 127. 1 *Dow. and Clarke*, 365, *Hanby vs. Roberts*. 2 *My. and Cr.*, 700, *Mirehouse vs. Scaife*. 2 *Johns. Ch. Rep.*, 614, *Lupton vs. Lupton*. 1 *White and Tudor*, 450. 3 *Bligh.*, 84, *Spong vs. Spong*. 10 *G. & J.*, 159, *Tolson vs. Tolson*. There is moreover on the face of the will an intent manifest, that all the residuary estate in the hands of the residuary devisee shall be applied to the payment of the debts in exhoneration of the negroes.

3rd. In the absence of any such intention, the real estate in the hands of the devisees of the widow, who was the devisee of the first testator, are liable in payment of his debts in exhoneration of the negroes who are manumitted by the will of the widow to be free after brief terms.

4th. Upon general principles debts contracted in the purchase of the real estate are first to be paid out of such estate, in relief of the personal estate of the first testator in the hands of the personal representative of his legatee. 1 *Story's Eq.*, sec. 576. 1 *Beavan*, 209. 3 *Johns. Ch. Rep.*, 229, *Duke of Cumberland vs. Codrington*. 10 *G. & J.*, 107, *Gibson vs. McCormick*. 3 *Md. Ch. Decisions*, 80, 81.

5th. As against the administrators *de bonis non*, the specific legatee or her representative has an equity to restrain a sale of the negroes specifically bequeathed, until the assets can be marshalled and properly applied under the direction of this court. 1 *Jacob*, 108, *Clarke vs. Ormonde*. 6 *Gill*, 299, *Cornish vs. Wilson*. 9 *Pet.*, 461, *Fenwick vs. Chapman*.

*Wm. Schley* for the devisees of Mrs. Carroll.

1st. We insist, that by the true construction of the act of 1849, ch. 229, the real estate of Michael B. Carroll passed by his will to his widow, Jane M. Carroll. This is the case of a will executed before, and where the testator died after, the passage of the act, and after the 1st of June 1850. Inde-

pendent of this act, after acquired lands would not pass, even though the testator expressed by his will a desire that they should pass, and it was to remove this *hard and rigorous* rule of the common law that the statute in question was enacted. In this case there is no question as to its *constitutionality,*— the only question is, what did the legislature mean by the enactment? The 1st section says, that "*every* last will and testament executed *in due form of law*, after the first *day of June* next, shall be construed," &c. The first day of June is the *time* fixed for the taking effect of this *new* rule of interpretation, and not the period after which wills must be *executed* upon which the law is to operate. It is the introduction of a *new rule* for the ascertainment of the *intention* of testators. There was sufficient time given for the public to become acquainted with the law, and why should it not go into effect on that day?

But the second section strengthens, and is conclusive in favor of this interpretation, for it does not except *every* will executed before the passage of the act, but only those executed before that time by persons who *may die* before the 1st of June and therefore all wills *not excepted* are within the provisions of the law. The cases in 4 *Scammon*, 64; 10 *Paige*, 140; 6 *Mass.*, 149; 5 *Pick.*, 112, relate to the construction of the will as to the intention of the testator, and are not applicable to the case of a *rule* of interpretation introduced by an act of legislation. Acts of Assembly are to be construed like *deeds*—the great object being to ascertain the intention of the legislature. Less regard must be had to the *words* than to the *policy* of the law. 50 *Law Lib.*, 165, 168, 169. See also as to the interpretation and construction of this act, 19 *Eng. C. L. Rep.*, 75. 28 *Do.*, 103. 33 *Do.*, 307. 45 *Do.*, 756, 757. 58 *Do.*, 855. 64 *Do.*, 121, 123, 125. 14 *Mees. and Wels.*, 39. 1 *Brock.*, 162. 2 *Cranch*, 33, 358. 3 *How.*, 556. 4 *G. & J.*, 152. 9 *Gill*, 137, 229. 12 *Metcalf*, 169, 262.

2nd. There is no equity between the personal representatives of Mrs. Carroll and the devisees of her real estate, that

the real estate devised to her by the will of Mr. Carroll, shall be applied to the payment of the debts of Mr. Carroll in *exhoneration* of the personal estate bequeathed to her by the same will; nor even that such real estate shall *contribute* with such personal estate towards the payment of such debts. There is no marshalling of assets where the *same* person is both devisee and legatee, and the rule of law must apply that the personal estate of the deceased is primarily applicable to the payment of his debts. Could Mrs. Carroll have asked that the lands be sold in *exhoneration* of the negroes? or if some one else had been legatee of the slaves, could such person restrain Mrs. Carroll, as executrix, from selling them to pay the debts of the testator? They were given only *after payment* of debts. He does not exempt his *entire* personal property, but only *requests* that his debts be paid out of his *other personal* estate; he does not *charge* the debts upon the land. He did not contemplate that his other personal property would *not* be sufficient; it is therefore a case where the testator has made *no* provision, and the law must make it for him. In 8 *G. & J.*, 234; 5 *G. & J.*, 344, and 2 *Gill*, 134, there was a presumption from lapse of time that the debts had been paid, but such is not the case here. I therefore conclude the complainants have no capacity to maintain the suit.

*Reverdy Johnson* for the heirs at law.

The question I propose to discuss *first* is, whether the lands passed by the will of Mr. Carroll or descended to his heirs at law? The will was executed the 10th of September 1837, the act was passed in February 1850, and the testator died in August 1851. Now we say this act applies only to wills *executed after* the 1st of June 1850. As we read the *first* section the *date* there referred to has reference to the *execution* of the wills, and not to *the time when the rule* was to go into operation. If the other reading prevails, it applies to all wills executed in this State at any time, from colonization down to the present day, although they may have been the subject of judicial construction, and the rights of parties settled under them.

Could the legislature have meant this act to operate thus retrospectively, and *uproot and divest* titles? In 12 *Metcalf*, 264, the court say, that in all cases where a different construction would divest vested rights, the act should be construed prospectively and not retrospectively.   Here the construction contended for on the other side would take property from the heir and give it to the devisees in all wills executed before the 1st of June 1850, wherever it had been acquired subsequent to the date of the will.   But it is manifest our reading is the true one. The word *"executed"* is twice used in the first section, and each time in the same sense; in the second instance it obviously applies to the *time* of making the will, and so it must in the first.   But the third section says the act shall go into operation on the 1st of June next; this was unnecessary if the words of the first section would have the same effect, the words of the first section must therefore have some different meaning.   In the second section the word *"executed"* is also used and clearly in reference *to time.*   The second section would not apply to any will executed *after* the passage of the act by a person who may die before or after the 1st of June. The two contingencies of antecedent execution and antecedent death must both concur.   Again, when is the rule to operate as to wills embraced in the second section?   Not unless the *design* of the testator is manifest that the after acquired property should pass, and in the first section there must be a clear intent to the contrary.   Now by the construction of the other side the first section would embrace all wills, and yet there can be no reason for this distinction as to the manifestation of intent.   Why should there be a different rule as to wills executed before the 1st of June and those *after*, and where the testator dies before the passage of the act. But again, the Circuit Court of the United States has decided the construction of this act in our favor, upon a bill filed by the heirs at law.   That court has concurrent jurisdiction, and having attached there first it becomes *exclusive.*

2nd.  Supposing the lands descended, are they liable for debts?   The other side say they are:—1st, because the will

means so, and 2nd, because the law appropriates them first for that purpose. Now, first, as to the meaning of the will. The language is *"after payment of debts,"* and it is clear the testator meant to devise nothing *until his debts were paid.* Immediately after this he gives his slaves to his widow; did he mean by this to give them with a charge of the debts upon the land? He directs his debts to be paid out of his *"other personal estate,"* and if it had been his intent to charge his lands, we should have found it in this clause of his will. But the will gives the slaves to his wife, makes her executrix, and also residuary legatee of both *his real and personal estate.* How can there be a marshalling of assets where the specific legatee is the only legatee of the entire property claimed to be marshalled? As a general rule, whether the lands are devised or descended, there is no obligation to *pay* or *contribute,* except in cases of specialty debts, and in this bill there is no allegation that any such debts exist. The reason of the rule is obvious, because the specialty debts are binding upon the heir at law. 11 *G. & J.,* 203. 1 *Brown's Ch. Rep.,* 450. 3 *Ves.,* 108. Where the debt is due by simple contract it is first to be paid out of the *personal estate.* 1 *Story's Eq., sec.* 576. 3 *Johns. Ch. Rep.,* 229. 10 *G. & J.,* 147. Where a person has lands descended or devised to him *charged* with an incumbrance, he is bound only in respect to the lands so devised or descended, and they must pay the debt. 3 *Md. Ch. Decisions,* 81. But where the debt is due by the purchaser himself this rule does not apply.

*John Nelson* on the same side, in addition to the views presented by Mr. Johnson, as to the act of 1849, argued that there was a view which might reconcile the apparent conflict between the 1st and 2nd sections. The 1st provides for all wills executed after the 1st day of June succeeding the passage of the act, and the second provides for a class of wills executed before that day, provided the intent of the testator was manifest that the after acquired property should pass. Now if you strike out the negation in the second section and read it

affirmatively, viz: "that the provisions of this act *shall* apply to any will executed before the passage of this act, by any person who may die before the 1st day of June next, *provided*, in such will the intention of the testator shall appear" &c., there will be no difficulty. He also cited as to the construction of a similar act in *Penn.* 5 *Watts and Seargt.* 198. And *Dunlap's Law of Penn.* 572. As to the other questions involved in the case, he urged views similar to those presented by Mr. Schley and Mr. Johnson.

*Thos. S. Alexander* for the appellants in reply.

I shall first contend that the lands passed by the will. The rule of construction prior to the act of 1849, violated the express intent of the testator, and the design of that act was to change this rule and place wills of realty and of personalty on the same footing. The question then is upon the construction of this act. The meaning of the first section is that *every will executed according to law,* shall after the 1st of June, be construed to speak and take effect, &c. The word *every* cannot be gratified without including wills executed *before* the 1st of June. The *second* section shows that the legislature knew that by the first section, they had used words which would embrace the class of wills exempted by the second, unless they were provided for by an express exception. The words are, "the provisions of this act shall *not apply* to any will executed before the passage of this act, by any person who *may die* before the 1st of June," &c. Does not this show that but for this exception the *first* section would have embraced them? The argument on the other side would require us to *strike out* the second section and make a new one in its place, a power which it is not within the province of the courts to exercise. What conceivable reason is there why the rule should not operate upon wills made before the passage of the act, by persons who die after the 1st of June? The testator lives until after the day, and would change his will if he intended to exclude it from the operation of the act. Our construction only excludes that small class of wills which may be

executed after the passage of the act and before the first of June, and these the equity of the act clearly embraces. The third section has been thrown in as an obstacle to our construction, but the other side have not removed it out of the way of their own. The argument as to the uprooting of titles so strenuously relied on, overlooks the healing provisions of the statute of limitations, which would protect a vast number of titles. But again, there is a vast difference between an act divesting vested rights, and one adopting a rule of construction which is to operate upon instruments not now perfected, but to be perfected at a future day, the death of the testator. The argument of Mr. Nelson, admits that the second section applies to wills executed *before* the passage of the act, and this construction would introduce all the evils as to uprooting of titles, deprecated by the argument of Mr. Johnson.

2nd. Suppose the lands descended, have we equities against the heirs at law? The *specific legatee* has no equity to ask that lands descended be applied in exhoneration of his legacy. It is admitted that the bequest of freedom is a *specific legacy,* and we rely upon the case of *Chase vs. Lockerman,* as to the lands held at the date of the will. After acquired lands are also in the same category. 3 *Johns. Ch. Rep.,* 312. 2 *Atk.,* 424. *Dickens,* 382. These cases answer the argument that lands are not to contribute except upon the ground of a charge either express or implied, and that there could be no charge here, because the lands were acquired after the date of the will. If the specialty creditors exhaust the personalty, the simple contract creditors will be substituted in their place as against the realty. 2 *Wms. on Ex'crs.,* 1457, 1460. See also the act of 1785 *Ch.* 80, *Sec.,* 7. 3 *Johns. Ch. Rep.,* 156, and 6 *Gill,* 306. There is besides in this case not only a specific gift of the negroes, but a *request* that none of them should be sold, which is equal to a command according to the case of *Tolson vs. Tolson,* 10 *G. & J.,* 159.

3rd. Assuming that the lands passed by the will, we then have an end to the distinction as to after acquired lands. In such case the specific legatee of personalty and the specific

Magruder and Tuck, *vs.* Carroll, *et al.*

devisee of realty are to contribute ratably to the payment of debts. 1 *Ambler*, 127. 1 *Dow. and Clarke*, 365. 2 *My. and Cr.*, 700. But again here is a charge to pay debts, so far as the words "after payment of debts" indicate the intent of the testator. These words create a charge upon the land. 2 *Johns. Ch. Rep.*, 623. 10 *G. & J.*, 147. The fact that *Mrs. Carroll* unites in herself the two characters of specific legatee and residuary devisee, makes no difference in the application of the principle of marshalling of the assets.

4th. We have already had possession of the negroes more than two years, much beyond the time allowed by law for the settlement of the estate, and we are presumed now to hold them as legatee and not as executrix. The order of the orphans court is *ex-parte* and could not prejudice the rights of the negroes. Our equities are these over which that court has no jurisdiction whatever. 8 *G. & J.*, 160. 7 *G. & J.*, 96. 6 *G. & J.*, 306.

Le Grand, C. J. delivered the opinion of this court.

This is an appeal from an order of the circuit court of Prince George's county, sitting as a court of equity, refusing to grant an injunction to prevent the sale, under an order of the orphans court of the same county, of certain negroes belonging to the estate of the late Michael B. Carroll.

The bill in substance alleges that, Mr. Carroll being possessed of a large estate, real and personal, made his will in 1837 and died in August 1851. That he specifically devised and bequeathed the principal part of his estate to his wife, who after making a will by which she manumitted the negroes, died in 1853. That subsequently to the making of his will, he sold a portion of the real estate of which he was seized at the time of making his will, and purchased other real estate for which he did not pay, and of which he died seized.

The bill claims because of a request contained in his will, that his negroes should not be sold or disposed of for the payment of his debts, but that provision should be made for discharging the same out of the other personal property and effects,

44    v.4

which he should leave at the time of his death, that his real estate and other personal property should be first applied to the payment of his debts before the negroes are resorted to. It also claims that the negroes were manumitted by the will of Mrs. Carroll, alleging that at the time of the making of her will, she held them not as executrix of her husband, but as legatee under his will.

The bill also alleges a sufficiency of real estate and personal property other than negroes, to pay all the debts of the estate of Mr. Carroll.

The heirs at law of Michael B. Carroll, claim the lands acquired by him subsequently to the execution of his will, in virtue of that inflexible rule of the common law, which declares that no devise can pass real estate acquired after making of the will, although the will should be express that it should pass.

In opposition to this pretension it is said, that the act relating to devises passed at December session 1849, chapter 229, alters the common law rule and must determine the rights of all parties under the will of Mr. Carroll.   That our interpretation of it may be the better understood, we give it entire.   The 1st section is as follows: "That every last will and testament executed in due form of law after the first day of June next, shall be construed with reference to the real estate and personal estate comprised in it to speak and take effect as if it had been executed on the day of the death of the testator or testatrix, unless a contrary intention shall appear by the will." The 2nd section is in these words: "That the provisions of this act shall not apply to any will executed before the passage of this act, by any person who may die before the first day of June next, unless in such will the intention of the testator or testatrix shall appear, that the real and personal estate which he or she may own at his or her death should thereby pass." The 3rd section provides that the law shall take effect on the first day of June 1850.

Michael B. Carroll made and published his will in the year 1837 and died in August 1851.

We understand this act of Assembly has been considered and judicially interpreted by the chief justice of the United States, in a case recently tried in the circuit court for the district of Maryland, and that he held it not to operate upon wills executed *prior* to the first day of June 1850. We have not seen the reasons for this opinion, and sincere and profound as is our respect for the legal erudition and great mental acumen of that distinguished jurist, we nevertheless cannot concur in the interpretation imputed to him. Our opinion is, that the act has a retroactive operation, and does control the construction of wills executed before the first day of June 1850. We do not say that it alters the common law rule of interpretation as regards *all* wills executed prior to that time, but merely wish to be understood as deciding, that a will executed before the time mentioned in the act may, according to circumstances to which we will presently advert, fall within its purview and be controlled by it, and that we regard the will of Mr. Carroll of such character.

On the part of the heirs of Mr. Carroll, it was very ably and ingeniously argued, that the first section ought to be interpreted so as to place in immediate connection the words "after the first day of June," with the preceding word "executed," and thus confine the operation of the section to those wills which should be executed after the first day of June 1850; while on the part of the complainants it was contended, that the words "first day of June" ought to be understood as fixing the period after which all wills, no matter when executed, should receive the indicated construction.

So far as this section is concerned, if we confine ourselves to the grammatical sense of the words of which it is constructed, its interpretation will depend upon the accentuation which may be given to certain parts of it, and on this rests the opposing theories in regard to its true meaning. It may be read so as to make it applicable only to such wills as should be executed after the first day of June 1850, or with equal propriety, so as to make *its rule* of construction applicable after the said first day of June 1850, to a will executed before or after that day,

if it were executed in due form of law. The act is very inartificially drawn, and is a striking instance of what grammarians term a false collocation of words, whereby their intended significance is rendered doubtful.

If the act were constituted of the first section we would not experience any difficulty in deciding, that it was intended, and did in fact, operate only on wills executed after the first day of June 1850; and this interpretation would be in consonance with the well established principle, that statutes are not to have a retroactive effect, unless it be perfectly obvious it was the intention of the legislature. But the great difficulty arises out of the second section.

The first section, when taken in connection with the second, has, in our judgment, an operation on devises executed before the first day of June 1850. It is a well recognized canon of interpretation, that if any part of a statute be intricate, obscure or doubtful, the proper way to discover the intent, is to consider the other parts of the act; for the words and meaning of one part of a statute frequently lead to the sense of another, and in the construction of part of a statute, every other part ought to be taken into consideration. *Dwarris on Stat.*, 697.

Keeping this rule in view, the question is presented—what is the effect of the second on the first section of the act? It declares that "the provisions of this act shall not apply to any will executed before the passage of this act, by any person who may die before the first day of June next, unless in such will the intention of the testator or testatrix shall appear, that the real and personal estate which he or she may own at his or her death, should thereby pass."

As we understand this second section it provides for an *exemption* of certain wills from the operation of the statute: to wit, wills made *before* the 23rd day of February 1850, if the testator or testatrix might die before the first day of June 1850, and in which the intention of the testator or testatrix does not appear that the real and personal estate which he or she may own at his or her death, should thereby pass. In other words,

we regard the first section when taken in connection with the second, (and according to the well established rules of interpretation we are bound to so consider it,) as referring to wills executed before as well as after the first day of June 1850, and that the office of the second section is merely that of an exception, to withdraw from the general purview and operation of the first section, the particular wills specifically mentioned in the second section.

From this it follows ; if a party made a will before the 23rd day of February 1850, and died before that day, or, if he made a will *before* and died *after* the first day of June 1850, then the statute would operate whether or not his intention was expressed in his will, that all his real and personal estate at the time of his death should thereby pass ; the exemption from the operation of the law as specified in the second section requiring two things :—1st. That the will should have been made *before* the 23rd day of February 1850 ;—and 2nd. That the testator *might* die *between* the 23rd day of February and the first day of June. In other words, the section cont........ *as in existence* at the time of the passage of the act........ whose will was to be embraced by the *exemption*. The language is not, that *shall have died* before the first d..... but *"who may die"* before that day. The death was an event to happen *after,* and not one which may have tak.......... *fore* the passage of the act.

If the construction insisted on by the counsel for the heirs of Mr. Carroll be adopted, then, the second section of the act has no meaning, for if the first section only applied to wills to be executed after the first day of June 1850, there was no necessity by the second section to *exempt* from its operation any will executed before that day.

But it is urged, that the construction which we have given would, in some instances, operate great confusion and uncertainty. This may be so, but this would be the effect of any of the interpretations which have been placed on the act by those who suggest this difficulty. To avoid such results, the second section would have to be expunged from the act, and this, we

have no power to do. But in a case like the one before us there is no such consequence. So far as this case is concerned there is no question of vested rights. The statute, to use the language of the court in the case of *Pray and another, vs. Waterston, et al.,* 12 *Metcalf,* 264, "disturbs, (in this case,) no vested rights, *for before the death of the testator his heirs had no right whatever to any part of his estate.* This statute therefore is to be construed according to the meaning of its language and the intention of the legislature." The will was made before the passage of the act, *and the testator did not die until more than a year thereafter.* The law imputes knowledge to him of the provisions of the act of 1849, and the interpretation it would receive. He had ample time to alter his will, and failing to do so must be considered as having intended all his property real and personal should pass under it. This view, as already observed, does not interfere with any vested rights of the heirs of Mr. Carroll, for they could not have any *before his death,* and this did not occur until after the first day of June 1850—not until August 1851.

But, whilst we do not concur in opinion with the counsel for the heirs as to the true meaning of the act of 1849, we nevertheless are of opinion the circuit court properly refused to grant the injunction asked.

The bill is filed by the executors of Mrs. Carroll against the administrators *de bonis non* of Mr. Carroll and his heirs at law. The gravamen of it is, that he specifically bequeathed his negroes to his wife and desired they should not be sold, and that his debts should be paid out of his other estate. That she manumitted them, and that there is other personal and real estate enough to pay the debts due by his estate. Injunction is asked to prevent the sale of the negroes under an order of the orphans court of Prince George's county, which, it is alleged, is about to be done. It is also claimed in the bill, that at the time of the will of Mrs. Carroll she must be considered as holding the negroes as legatee and not as executrix, the time specified by law for winding up the estate of her husband having elapsed.

This last ground cannot avail. There is no allegation in the bill that a *final* account had been settled by her, and the bill shows that a large amount of debts remained unpaid, and that the creditors of the estate of her husband had commenced proceedings to secure their payment, which proceedings are still pending. In this claim of the bill we suppose but little confidence was, or is reposed by those who framed it; at all events, there is nothing in it. There is nothing in the facts of the case to justify the presumption, that there had been a final settlement of the estate of Michael B. Carroll, and all its debts paid off; the truth is, the bill directly contradicts the facts out of which such a presumption could arise.

It is contended on the part of the complainants, that the real estate and personal property, other than the negroes of Michael B. Carroll, ought to be applied to the payment of his debts before the negroes are resorted to. This may or not be so, and in regard to it we pass no opinion, because the question is not before us in this case. *This is not a bill filed on behalf of the negroes*, but by the executors of Mrs. Carroll, and they must occupy the same position in regard to the creditors of Michael B. Carroll, who are represented by the administrators *de bonis non*, as she would have done had the bill been filed by her instead of by them. And if she were the party complainant how would the case stand? Why thus:—Michael B. Carroll died in debt leaving a will, by which his real and personal estate is specifically devised and bequeathed to his wife. His *creditors* would have the right to proceed against his entire estate for payment, first, however, against the personal as the primary fund. *Their* rights could not be affected by anything he might request in his will; their claims would attach to his entire estate. *He did not manumit his slaves;* and, moreover, this is not the case of contribution and marshalling of assets between *different* devisees and legatees, because here Mrs. Carroll was specific devisee and legatee, and residuary devisee and legatee; she in fact, with but trifling exception, took under the will the whole estate. Had she, immediately on obtaining letters

of administration, manumitted the negroes, it could not be pretended such manumission could have affected the rights of the creditors of her testator; and, it must be obvious, if she could not do it by her act as executrix, that she could not accomplish it by her will.

For these reasons we affirm the order of the circuit court refusing the injunction.

*Order affirmed.*